

SEALED

1  BENJAMIN B. WAGNER
United States Attorney

2  JEFFREY A. SPIVAK
Assistant United States Attorney

3  United States Courthouse
2500 Tulare Street, Suite 4401

4  Fresno, California 93721
(559) 497-4000  Telephone

5  (559) 497-4099  Facsimile

**FILED**

**JUN 24 2015**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

6  Attorneys for the United States

7                IN THE UNITED STATES DISTRICT COURT

8                  EASTERN DISTRICT OF CALIFORNIA

9

10  UNITED STATES OF AMERICA,

11                          Plaintiff,

12                  v.

13  APPROXIMATELY $3,801,034.94 IN
U.S. CURRENCY SEIZED FROM

14  CITIBANK ACCOUNT NUMBER
206054579 HELD IN THE NAME OF

15  ARTHUR AVE. CONSULTING, INC.
AND/OR PROPERTY TRACEABLE

16  THERETO.

17  APPROXIMATELY $21,865.67 IN U.S.
CURRENCY SEIZED FROM CITIBANK

18  ACCOUNT NUMBER 205912785 HELD
IN THE NAME OF ARTHUR AVE.

19  CONSULTING, INC. AND/OR
PROPERTY TRACEABLE THERETO,

20
APPROXIMATELY $2,031,022.25 IN

21  U.S. CURRENCY SEIZED FROM BANK
OF AMERICA ACCOUNT NUMBER

22  325016557963 HELD IN THE NAME OF
MARTEL 3D, LLC. AND/OR PROPERTY

23  TRACEABLE THERETO; and

24  APPROXIMATELY $120,883.59 IN U.S.
CURRENCY SEIZED FROM BANK OF

25  AMERICA ACCOUNT NUMBER
000577161654 HELD IN THE NAME OF

26  MARTEL 3D, LLC. AND/OR PROPERTY
TRACEABLE THERETO

27
                    Defendants.

28

CASE NO. 1:15 CV 00954 AWI SKO

**VERIFIED COMPLAINT FOR
FORFEITURE IN REM**

Plaintiff, the United States of America, brings this complaint in accordance with Supplemental Rule G(2) of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions, and alleges as follows:

<u>**Nature of the Action**</u>

This is a civil action to forfeit and condemn to the use and benefit of the United States of America the proceeds of a violation of the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778 *et seq*, that are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

<u>**Jurisdiction and Venue**</u>

1.     This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

2.     This Court is the proper venue pursuant to 28 U.S.C. § 1395, because the United States' claim accrued in this district, and the property to be forfeited was seized and/or brought in this district. 28 U.S.C. § 1395(a), (b), (c).

<u>**The Defendants-In-Rem**</u>

3.     The defendants *in rem* consist of the following:

    a.  Funds up to and including the amount of approximately $3,801,034.94 in U.S. Currency seized from Citibank Account Number 206054579 held in the name of Arthur Ave. Consulting, Inc., (the "Arthur Ave. Money Market Funds");

    b.  Funds up to and including the amount of approximately $21,865.67 in U.S. Currency seized from Citibank Account Number 205912785 held in the name of Arthur Ave. Consulting, Inc. (the "Arthur Ave. Checking Account Funds");

    c.  Funds up to and including the amount of approximately $2,031,022.25 in U.S. Currency seized from Bank of America Account Number 325016557963 held in the name of Martel 3D, LLC (the "Martel 3D Savings Account Funds"); and

    d.  Funds up to and including the amount of approximately $120,883.59 in

1         U.S. Currency seized from Bank of America Account Number

2         000577161654 held in the name of Martel 3D, LLC (the "Martel 3D

3         Checking Account Funds" and, together with the Arthur Ave. Money

4         Market Funds, the Arthur Ave. Checking Account Funds, and Martel 3D

5         Savings Account Funds, together, collectively, the "Defendant Currency").

6     4.   The Defendant Currency was seized on February 2, 2015, and is in the

7 custody of the U.S. Department of Homeland Security, U.S. Customs & Border Protection.

**Facts Supporting Forfeiture**

9     5.   The Defendant Currency was seized pursuant to four Seizure Warrants (the

10 "Seizure Warrants") issued on February 2, 2015, by the Hon. Gary S. Austin, United

11 States Magistrate Judge, United States District Court, Eastern District of California.

12     6.   The below table indicates the Seizure Warrant numbers that correspond to

13 each of the four defendants *in rem* that are covered by this Complaint:

| Asset | Seizure Warrant | Authorized Seizure Amount | Actual Amount Seized |
|---|---|---|---|
| Arthur Ave. Money Market Funds | 1:14-SW-00023-GSA | $4,000,000.00 | $3,801,034.94 |
| Arthur Ave. Checking Account Funds | 1:14-SW-00024-GSA | $350,000.00 | $21,865.67 |
| Martel 3D Savings Account Funds | 1:14-SW-00025-GSA | $2,296,091.82 | $2,031,022.25 |
| Martel 3D Checking Account Funds | 1:14-SW-00021-GSA | $330,763.70 | $120,883.59 |

22     7.   In issuing the Seizure Warrants, the Court found probable cause to believe

23 that the funds in the four seized bank accounts, up to an amount authorized, were the

24 proceeds of AECA violations and therefore subject to seizure and forfeiture to the United

25 States.

26     8.   Each Seizure Warrant was supported by an identical affidavit, that of U.S.

27 Department of Homeland Security, Homeland Security Investigations Special Agent, Jerry

28 Kiser.

Verified Complaint for Forfeiture *In Rem*     3

9.     The United States' allegations regarding the forfeitability of the Defendant Currency were and are set forth in the Affidavit (attached hereto as Exhibit A).

### FIRST CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(C) – Proceeds of an AECA violation)

10.    The United States repeats and realleges each and every allegation set forth in the above paragraphs (including the attached Affidavit).

11.    Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title)[.]"  Under Title 18, United States Code, Section 1956 (c)(7)(D), an AECA violation constitutes a "Specified Unlawful Activity."

12.    The Defendant Currency was property, real or personal, which constitutes or is derived from proceeds of a violation of the AECA, 22 U.S.C. § 2778 *et seq.*, or represented proceeds traceable to such property.

13.    As a result of the foregoing, the Defendant Currency is therefore liable to condemnation and forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

### Conclusion

WHEREFORE, the United States respectfully asserts that there is reasonable cause to believe the Defendant Currency is forfeitable to the United States under 18 U.S.C. § 981(a)(1)(C) and requests::

1.     That notice of this action be given to all persons known or thought to have an interest in or right against the Defendant Currency ;

2.     Pursuant to Supplemental Rule G(9), this matter is to be scheduled for a bench trial unless any party demands trial in compliance with Federal Rules of Civil Procedure, Rule 38, within 14 days of the service of this pleading;

3.     This Court enter a judgment of forfeiture of the Defendant Currency to the United States;

4.     This Court grant the United States its costs and whatever other relief to

1 | which it may be entitled; and

2 |   5.   For such other and further relief as the Court deems just and proper.

3 |

4 | Dated:  June 24, 2015                    BENJAMIN B. WAGNER
                                             United States Attorney

5 |

6 |                                           /s/ Jeffrey A. Spivak
                                             JEFFREY A. SPIVAK
7 |                                          Assistant United States Attorney

## VERIFICATION

I, Jeremy Kiser, hereby verify and declare under penalty of perjury that I am a Special Agent with the U.S. Department of Homeland Security, Homeland Security Investigations, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent with Homeland Security Investigations.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated: 6/22/15

JEREMY KISER
Special Agent
Homeland Security Investigations

Complaint for Forfeiture *In Rem*                    5

Exhibit A

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR SEIZURE WARRANT

I, Jeremy Kiser, Special Agent with the Department of Homeland Security, Homeland Security

Investigations (HSI) being duly sworn, depose and state as follows, to wit:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with Homeland Security Investigations (HSI) and have been so

employed for approximately nine years.   Prior to my employment with HSI, I served as a U.S.

Customs and Border Protection Officer for three years.   As a requirement for my employment as

an HSI Special Agent, I successfully completed a twelve-week Criminal Investigator Training

Program (CITP) located at the Federal Law Enforcement Training Center (FLETC) in Glynco,

Georgia. At the conclusion of CITP, I completed an additional twelve-week Immigration and

Customs Enforcement Special Agent Training Academy.  · As part of my training at FLETC, I

received extensive instruction in the areas of Immigration law, Customs law, firearms training,

rules of evidence, and interview techniques.

2.      As a Special Agent with HSI, my duties include, among other things, the investigation of

criminal violations of import/export law and violations of the Arms Export Control Act ("AECA")

as proscribed by 22 U.S.C. § 2778, and the International Trafficking in Arms Regulations

("ITAR"), as proscribed by 22 C.F.R Part 120, et. seq.   Moreover, as a HSI Special Agent, your

affiant is generally authorized to investigate violations of the laws of the United States and to

execute search and seizure warrants issued under the authority of the United States.

3.      I am is familiar with Federal criminal laws relating to the unlawful export of arms and

commodities from the United States, as determined by the Department of State (DOS), Directorate

of Defense Trade Control (DDTC), the Department of Commerce (DOC), Bureau of Industry and

Security (BIS), and the Department of Treasury, Office of Foreign Asset Controls (OFAC), as

these agencies have statutory responsibility and authority to regulate this area. See 22 U.S.C. §

2778; 22 C.F.R. § 120 et seq.

1

4.      I have also participated in investigations of violations of United States laws relating to the unlawful export of arms and commodities that are export-restricted for reasons of national security, foreign policy, and anti-terrorism.   Furthermore, your affiant has received training related to identifying the techniques, methods, and procedures employed by groups, organizations, companies in violation of United States export laws.   Finally, your affiant has received specific instruction and training in the conduct of criminal investigations associated with export-law violations, which included investigation associated with violations of the AECA and ITAR. Specifically, in addition to my basic training outlined above, I attended an advanced two-week Arms and Strategic Technology Investigation seminar, where I received advanced instruction in the areas of the AECA, ITAR, Export Administration Act , and Trading with the Enemies Act .

5.      Based on my training, education, experience and discussions with other federal agents related to the investigation of international export-related violations, I know that maintaining an unlawful export and/or brokering scheme is often labor intensive, in that it involves: (1) the procurement of defense articles from various sources within and/or without the United States; (2) extensive dealings with foreign nationals from foreign countries requesting defense articles; (3) arrangements related to the international exportation of various defense articles from the United States and/or foreign countries to other foreign countries; (4) certain unlawful conduct committed in furtherance of concealing or evading the prohibitions and licensing requirements of the AECA and the ITAR; and (5) the maintenance of business records related to and resulting from the exportation and/or brokering of defense articles and the accrual of illegally derived profits from these activities.

6.      From my training and experience, individuals engaged in illicit activities and/or money laundering of illicit funds will often attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's

2

check, money drafts, traveler's checks, wire transfers, money orders, and other means of value transfer.

7.     Also based on my training and experience, it is common for persons engaged in illegal activity to move the proceeds from illicit activities through multiple bank accounts and financial institutions, using known and unknown individuals, to "layer" the money in a way to provide insulation from detection and to give the money the appearance of legitimacy.  This is done in an attempt to complicate the paper trail and further disguise the true nature and source of the monies.

8.     I make this affidavit under Rule 41 of the Federal Rules of Criminal Procedure in support of the government's application for the issuance of a warrant authorizing the seizure of certain financial accounts (the "**Accounts**") more particularly described herein.

9.     The facts in this affidavit come from your my personal observations, training and experience, and information obtained from other agents and witnesses.   Because this affidavit is being submitted for the limited purpose of obtaining a seizure warrant, I have set forth only the facts that I believe are necessary, in compliance with 18 U.S.C. § 981(b) and Rule 41 of the Federal Rules of Criminal Procedure, to establish probable cause that the property to be seized is subject to forfeiture by the United States.

## DESCRIPTION OF PROPERTY TO BE SEIZED

10.    This affidavit is submitted in support of the government's application for the issuance of a warrant to seize the following property for civil and/or criminal forfeiture:

  a. The balance of funds maintained at Bank of America Savings Account Number #325016557963 titled in the name of "Martel 3D, LLC" in an amount not to exceed $2,296,091.82   (the "**Martel 3D Savings Account**");

  b. The balance of funds maintained at Bank of America Checking Account Number #000577161654 titled in the name of "Martel 3D, LLC" in an amount not to exceed $330,763.70 (the "**Martel 3D Checking Account**");

  c. The balance of funds maintained at Citibank Money Market Account Number #206054579 titled in the name of "Arthur Ave. Consulting, Inc." in an amount not to

3

exceed $4,000,000.00 (the "**Arthur Ave. Money Market Account**"); and

d. The balance of funds maintained at Citibank Checking Account Number #205912785 titled in the name of "Arthur Ave. Consulting, Inc." in an amount not to exceed $350,000.00 ( "**Arthur Ave. Checking Account**" and, together with the **Martel 3D Savings Account**, the **Martel 3D Savings Account** and the **Arthur Ave. Money Market Account**, collectively, the "**Accounts**.").

## LEGAL BACKGROUND

## ARMS EXPORT CONTROL ACT; THE INTERNATIONAL TRAFFIC IN ARMS REGULATION; BROKERING ACTIVITY

11.     The Arms Export Control Act (AECA), 22 U.S.C. 2778, regulates the export, import and brokering of military products. The AECA authorizes the President "designate those items which shall be considered as defense articles," and "promulgate regulations for the import and export of such articles. . . ." 22 U.S.C. § 2778(a)(1). The President has delegated rulemaking authority to the Secretary of State, whose office has promulgated the International Traffic in Arms Regulations (ITAR). 22 C.F.R. §§ 120.1-130.17. The ITAR contain the U.S. Munitions List, which list categories of "defense articles" that cannot be exported without first obtaining a license from the Department of State (DOS). 22 U.S.C. § 2778(b)(2); 22 C.F.R. §§ 120.6, 121.1, 123.1(a), 129.3.

12.     The registration and licensing requirements originally extended only to those individuals "engage[d] in the business of manufacturing, exporting, or importing" the articles and services on the Munitions List. 18 U.S.C. § 2778(b)(1)(A)(i); *see also* 22 U.S.C. § 2778(b)(2). In 1996, however, Congress enacted the Brokering Amendment, which expanded the scope of the AECA's registration and licensing requirements to cover "every person ... who engages in the business of brokering activities with respect to the manufacture, export, import, or transfer of" the articles and services on the Munitions List. 22 U.S.C. § 2778(b)(1)(A)(ii)(I). The AECA further defines brokering activities as including "the financing, transportation, freight forwarding, or taking of any other action that facilitates the manufacture, export, or import of a defense article or defense service." 22 U.S.C. 2778(b)(1)(A)(ii)(II).

4

13.　"Foreign defense articles or defense service" includes any non-United States defense article or defense service of a nature described on the United States Munitions List regardless of whether such article or service is of United States origin or whether such article or service contains United States origin components. 22 U.S.C. 2778(b)(1)(A)(ii)(IV).

14.　The ITAR defines a broker as any person "who engages in the business of brokering activities." 22 C.F.R. § 129.2(a). A broker includes (1) any U.S. person wherever located; (2) any foreign person located in the United States; and (3) any foreign person located outside the United States where the foreign person is owned or controlled by a U.S. person." 22 C.F.R. § 129.2(a)(1)-(3).

15.　The ITAR defines "brokering activities" as "any action on behalf of another to facilitate the manufacture, export, permanent import, transfer, reexport, or retransfer of a U.S. or foreign defense article or defense service, regardless of its origin." 22 C.F.R. § 129.2(b). Such action includes, but is not limited to: (i) financing, insuring, transporting, or freight forwarding defense articles and defense services; and (ii) soliciting, promoting, negotiating, contracting for, arranging, or otherwise assisting in the purchase, sale, transfer, loan, or lease of a defense article or defense service. 22 C.F.R. § 129.2(b)(1)(i)-(ii). Brokering activities also include activities performed by an affiliate. 22 C.F.R. § 129.2(b)(v). Further, engaging in the business of brokering activities requires only one occasion of brokering. 22 C.F.R. § 129.2(c).

16.　The AECA imposes a maximum imprisonment of twenty years and a fine of not more than $1 million. 22 U.S.C.§ 2778(c). A criminal sanction requires that a person "willfully" violate the statute or its regulations. *Id.*

## APPLICABLE ASSET FORFEITURE STATUTES

17.　A violation of the Arms Export Control Act (22 U.S.C. § 2278(c)) is a Specific Unlawful Activity (SUA). 18 U.S.C. § 1956(c)(7)(D). Pursuant to Title 18 U.S.C. § 981(a), all property that is the "proceeds" of a violation of an SUA is forfeitable to the United States. 18 U.S.C. §

5

981(a)(1)(C); 28 U.S.C. § 2461; see United States v. Newman, 659 F.3d 1235, 1240 (9th Cir.

2011) (explaining how Title 18 section   981(a)(1)(C) and Title 28 section 2461 authorize the

criminal forfeiture of proceeds of an SUA).   "Proceeds" is defined to include "any property

derived from or obtained or retained, directly or indirectly, through some form of unlawful

activity, including the gross receipts of such activity."   18 U.S.C. § 1956(c)(9).

18.     Title 18 U.S.C. § 981(b) authorizes the seizure of property upon a probable cause showing

that the property is subject to forfeiture.   Such seizure may be made pursuant to a warrant

obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal

Procedure.   18 U.S.C. § 981(b)(2).

19.     A seizure warrant issued by a judicial officer in one district may be executed in any district

in which the property is found, or transmitted to the central authority of any foreign state for

service in accordance with any treaty or other international agreement.   18 U.S.C. §981(b)(3).

## SUMMARY OF PROBABLE CAUSE

20.     As described above, no U.S. person may conduct "brokering activities" without approval

from DDTC.   Brokering activities include any actions to facilitate the transfer of defense articles.

Such activities include any financing relating to the transfer of defense articles.   At no point did

Dolarian, DCI or his affiliates receive DDTC approval to broker defense articles to Nigeria.   In

fact, in 2013 and 2014, DCI did not receive DDTC approval to conduct any brokering activities.

Yet without requisite approval, Dolarian, DCI and his affiliates took actions to broker defense

articles to Nigeria beginning in or around June 2014 (or earlier) and continuing throughout 2014.

21.     Specifically, (1) in early June 2014, DCI entered into Sales Agreements with Nigerian

government entities for the sale of weapons (the final of which contracts was valued at

$8,616,042.50); (2) in or around September 2014, DCI negotiated with arms vendors and made

payments to arms vendors for the acquisition of weapons intended to be transferred to Nigeria; and

(3) DCI received $8,618,647.00 in wire transfers from Nigeria (through a series of intermediaries)

6

that appear to be payments for the weapons contracted for between June and September 2014 intended for Nigeria – and such funds were not held in escrow but were used in part to pay a DCI agent in the Czech Republic and other expenses, and were transferred to bank accounts of various DCI-controlled nominee companies (a summary chart of these financial transactions is included below). All of these actions were taken without DDTC approval and constitute violations of the AECA.

## FACTUAL BACKGROUND

22.     I am currently conducting a joint investigation with the Department of Defense, Defense Criminal Investigative Service (DCIS) into the unlicensed brokering activities of Ara Dolarian (Dolarian), Dolarian Capital Inc. (DCI) and others affiliated with or working on behalf of Ara Dolarian.

23.     DCI is a company incorporated and registered in the state of California.   Record checks with the California Secretary of State, list DCI's address as "1280 WEST SHAW AVENUE, SUITE 102 FRESNO CA 93711." Dolarian is listed as the Agent for Service of Process.

24.     Open source checks reveal that Dolarian is the president and owner of DCI.   These checks revealed that DCI is an arms brokering company specializing in the sale of arms and munitions manufactured in Eastern European to foreign countries. DCI's website, www.dolarian.com, states that DCI is registered with the DOS, DDTC as a broker and manufacturer.   The website also advertises a variety of arms ranging from tanks to rifles and pistols.

25.     DCI's "Home" page purports in part that "the Company complies with the requirements and provisions governed by the International Traffic in Arms Regulations Act of 1976."

26.     DCI lists its point of contact email address as Dolarian@Dolarian.com.

27.     Checks with DDTC revealed that Dolarian is registered as the President/CEO of DCI as a broker with brokering registration code K2179.   In as late as 2011, DCI received DDTC approval to engage in certain select brokering activity. According to DDTC records, however, all DCI

7

brokering and export license applications submitted in 2013 and 2014 were returned without action or were denied. This means that during 2013 and 2014, DCI did not have permission to export arms or conduct arms brokering activities.

28.     On June 20, 2013, DDTC placed Dolarian under a policy of presumptive denial. The notification to Dolarian read:

> "This letter is to inform you that until the Department has completed its review and is satisfied that Dolarian Capital is compliant with the ITAR and has an effective defense trade and brokering compliance program in place, all pending and future license applications or other approval requests involving you or Dolarian Capital will be reviewed under a presumption of denial. Following a case-by-case review, exceptions may be granted, however, where the Department determines approval would be in the best interests of U.S. foreign policy or national security."

29.     In November 2014, DDTC conducted a meeting and interview with DCI, attended by Dolarian and Myron Smith (Smith), Dolarian's business partner and DCI's purported in-house counsel. This meeting was conducted in connection with an administrative investigation DDTC was conducting into Dolarian and DCI in connection with arms brokering activities.

30.     On December 8, 2014, Dolarian submitted a written response to the DDTC inquiry. This response included a summary of Dolarian's/DCI's activities in 2013 and 2014, as well as several exhibits, which included signed contracts, End User Certificates, correspondence to the DDTC and email communications between Dolarian and his representatives/affiliates. In January 2015, DDTC provided me a copy of this correspondence and the exhibits. Several exhibits provided to DDTC are detailed in this affidavit.

### ILLEGAL NIGERIAN BROKERING ACTIVITY

31.     On September 2, 2014, I received bank records from JP Morgan Chase in reference to DCI, Dolarian and Smith. These records, in conjunction with certain statements Dolarian made to US Customs and Border (CBP) officers (described in further detail below), and other facts described below, indicated to me that Dolarian and DCI was conducting arms brokering activities without the necessary DDTC licenses or approvals. A summary chart of the financial activities outlined

in this affidavit is provided on page 20 of this affidavit.

32.    The JP Morgan Bank records revealed that on June 17, 2014, Smith received a wire transfer of $4,998,647.00 into a newly opened JP Morgan checking account 588102975 in Fresno, CA (Smith's Checking Account (#2975)).   Smith opened the account on April 21, 2014.

33.    The $4,998,647.00 wire transfer was drawn on an HSBC-Hong Kong bank account #640116927838 (the Sawki HSBC Account), held in the name of a Hong Kong-based company, (HK) SK-Sawki Limited (hereafter Sawki).

34.    Open source records checks with the Hong Kong Government business database indicated that Sawki was established in Hong Kong by two citizens of Niger identified as Kabirou Abdoulkadri and Souleymane Siddo.   These same records show that Abdoulkadri and Siddo reside in China. Additional open source record checks indicated that Sawki is listed as a furniture company and has an internet presence as SK-SAWKI FURNITURE CO LIMITED, www.sksawkifurniture.abbo-twins.com.

35.    HSBC records indicated that just weeks before the June 17, 2014 wire transfer to Smith, the Sawki HSBC Account received two wire transfers of $9.999,990 (for a total of $19,999,980). The first wire transfer was on May 28, 2014.   The second wire transfer was on June 9, 2014. Both transfers originated from the National Security Adviser Office, Three Arms Zone, Abuja, Nigeria.   The first wire transfer originated from the Central Bank of Nigeria in Lagos, Nigeria. The second wire transfer originated from the First Bank of Nigeria PLC in London, England.   A notation for the second wire transfer indicated that the transfer was "Payment for Supply of Technical Equipment."

36.    Open source checks indicated that the National Security Adviser Office (NSAO) is an entity of the Nigerian Government under the Office of the President and is located in the Three Arms Zone of Abuja, Nigeria.   According to the United States Defense Attaché for Nigeria, the NSAO was allotted roughly $1 billion by the Nigerian Government in 2014 for the purchase of

military equipment. The Defense Attaché advised that each branch of the Nigerian Armed Forces now submits their military equipment requests through the NSAO.

37.  According to documents furnished by DCI to DDTC, on June 4, 2014 (13 days before the $4,998,647.00 wire transfer from Sawki), Dolarian executed two sales agreements with Hima Aboubakar, owner of Socite D' Equipments Internaionaux (S.E.I.), one for the purchase of 20mm autocannons (large caliber machine guns), and the second for 20mm ammunition, both for the Nigerian Ministry of Defense. The value of the contracts was $3,925,000.00.

38.  Open source research indicated that S.E.I has been involved in the attempted procurement of weapons on behalf the Nigerian Government.  Multiple online news articles detailed that S.E.I. was involved in an arms transaction with Cerberus Risk Solutions, a South African arms brokerage company.  The South African government reportedly seized $5.7 million wired to Cerberus by S.E.I. because Cerberus lacked the proper registration to sell and market arms in South Africa. Further, checks in U.S. government databases revealed that S.E.I. has been listed as the consignee (receiving party) on two exports of fuel tanker trucks to S.E.I. in Niger.  Both transactions listed Hima Aboubakar as the point of contact for S.E.I.

39.  According to documents furnished by DCI to DDTC, in June of 2014, Dolarian executed a third sales agreement with Aboubakar and S.E.I. for the purchase of the munitions listed below on behalf of Nigeria:

Weapon/Munitions
DEFA Type 553 gun
Arming wire for 125kg bomb ARM MLE FZA
Arming wire for 250kg bomb SECU MLE FZA
Arming wire for 250kg bomb SAMP MLE FZA
MARTA 155 Type Launch Pad
100kg bomb HE
250kg bomb
DEFA ammunition
Pylon, F71A
68 mm SNEB Rocket

10

The price of the this third contract was valued at $8,616,042.50.

40.     The DEFA 553 is a gas-operated five-chamber revolving cannon using pyrotechnic cocking and electrical ignition. It fires a range of 30 mm ammunition in various types, and is capable of continuous fire or of 0.5-second or 1-second bursts.   Based on my training and experience and review of the ITAR Section 121.1, the DEFA 553 is a defense article and is Category II (a), Guns over caliber .50 (12.7mm, whether towed, airborne, self-propelled, or fixed, including but not limited to, howitzers, mortars, cannons and recoilless rifles).

41.     The MATRA 155 launch pad is a SNEB rocket launcher which launches unguided air-to-ground 68 mm (2.7 in) rocket projectiles. The MATRA 155 launch pad designed for launch by combat aircraft and helicopters. Based on my training and experience and review of the ITAR Section 121.1, both the MATRA 155 and its 68mm rockets are defense articles and fall under Category IV- Launch Vehicles, guided missiles, Ballistic Missiles, Rockets, Torpedoes, bombs and Mines.

42.     The 250kg Bomb HE and 100kg Bomb HE are thick-walled metal cased projectiles with explosive filler. These bombs are a common weapon of fighter bomber and attack aircraft. Based on my training and experience and review of the ITAR Section 121.1, these bombs are defense articles and fall under category IV (a).

43.     On or about June 19, 2014, DDTC received a Brokering Application addressed to DDTC. DDTC assigned tracking number "BA-L-039-14" to DCI's application package.   This application package was received two days after Smith received the $4,998,647.00 wire from Sawki.

44.     In the brokering application, Dolarian and DCI requested permission to broker the sale of certain defense articles listed below to the Ministry of Defense, Nigerian Army.   Contained in the application package is an equipment list that details the following munitions DCI sought to sell to Nigeria:

    20x110mm ammunition
    20x110mm auto cannon

DEFA 155 type gun
Arming wire for 125kg bomb ARM MLE FZA
Arming wire for 250kg bomb SECU MLE FZA
Arming wire for 250kg bomb SAMP MLE FZA
MARTA 155 Type Launch Pad
Pylon, F71A
100kg bomb HE
250kg bomb

45.   Most of the items detailed in brokering application BA-L-039-14 are the same items listed in the executed sales agreements detailed in paragraphs 36 and 38 (many of which are "defense articles" under ITAR).

46.   While DCI's June 19, 2014 brokering request was pending with DDTC, DCI, Dolarian and Smith conducted a series of financial transactions in the United States with the proceeds of the $4,998,647.00 wire transfer they had received from Nigeria (through Sawki).

47.   On or about June 20, 2014, Dolarian and DCI opened two new bank accounts with JP Morgan Chase: (1) a business savings account in the name of DCI with JP Morgan Chase, which was assigned account number 3097758329 (#8329) with Dolarian is listed as President of DCI, and with Smith and Dolarian's wife, Mary Ann Dolarian, as additional signers on the account (the DCI savings account (#8329)), and (2) a business checking account in the name of DCI with JP Morgan Chase, this account was assigned account number 605982300 (#2300) with Dolarian listed as President of DCI, and with Smith and Mary Anne Dolarian as additional signers on the account (the DCI checking account (#2300)).

48.   Later that day, on June 20, 2014, Smith withdrew $4,199,646.57 from Smith's Checking Account (#2795), and those funds were deposited into the DCI savings account (#8329).   Further, $497k was transferred into the DCI checking account (#2300).   Thus, by June 20, 2014, $4,696,646.00 of the $4,998,647.00 wire transfer was in the newly created DCI bank accounts.

49.   On or about June 24, 2014, DCI drew a $150,000.00 check from the DCI checking account (#2300), which was deposited into the bank account of another Dolarian-controlled company, Martel 3D, LLC.   That Martel 3D bank account was a Bank of America checking account with

12

account number 000577161654 (**Martel 3D Checking Account**).   I searched MARTEL 3D in the California Department of State database. The search revealed that Mary Ann Dolarian (Dolarian's wife) is the Agent for Service for Martel 3D. The company's registered address is 2525 W Sierra Ave, Fresno, CA 93711. This is the home address of Ara and Mary Ann Dolarian.

50.     On June 26, 2014, DCI transferred $600,000.00 from the DCI savings account #8329 to the DCI account checking account #2300.

51.     On June 30, 2014, DCI wired $712,051.13 to Marion George Ford III (Ford III), from the DCI checking account #2300 to Ford III's Czech Republic-based bank account, UniCredit Bank account 0000056985021.

52.     On June 26, 2014 (four days prior to the wire $712k from DCI to Ford III), DCI and Ford III entered in to an agency agreement whereby Ford III agreed to be a representative of DCI.   The agreement stated:   "WHEREAS, Principal is a reseller/manufacture of various Defense products of Eastern and Western origin and desires to appoint Representative as its [non-exclusive] sales Representative to promote and sell Principal's products."

53.     On July 23, 2014, DCI transferred $3,599,823.67 from the DCI savings account #8329 back to Smith's Checking Account (#2975).

54.     On July 24, 2014, DCI transferred $169,717.85 from the DCI checking account #2300 back to Smith's Checking Account (#2975).   Those two transfers left the DCI savings account #8329 and the DCI checking account #2300 with zero balances.

55.     After July 24, 2014, just 34 days after the two DCI accounts had been opened and after roughly $5,000,000 had flowed through them, no additional transactions would flow through the two newly-created DCI bank accounts.   They were subsequently closed.

56.     With the bulk of the Nigeria-originated funds back in Smith's Checking Account (#2975), on July 29, 2014, Smith moved $3,000,000.00 by cashier's check from Smith's Checking Account (#2975) to another of Smith's bank accounts at JP Morgan Chase, Smith's money market account

#3302611677.  Then on August 26, 2014, Smith transferred an additional $160,000.00 from Smith's Checking Account (#2975) to Smith's money market account (#1677).  These transfers were conducted with no apparent business purpose.

57.     In or around July 2014, Smith created a new California corporation, "Arthur Ave. Consulting, Inc." in Fresno, California.   The registered agent is Myron Smith at 1284 W Shaw #103, Fresno, CA 93711.   Dolarian and his wife would soon after open two accounts with Citibank in the name of Arthur Ave. Consulting, Inc. (the **Arthur Ave. Checking Account** and the **Arthur Ave. Money Market Account**), and the money that originated from Nigeria would soon flow into these two accounts.

58.     Meanwhile, on July, 8, 2014, DDTC renewed DCI's broker registration.   Notwithstanding Dolarian's status as a registered broker, however, DDTC restated to Dolarian that he was continuing to operate under a policy of presumptive denial. The DDTC correspondence stated:

> "Notwithstanding the broker registration renewal, you and Dolarian remain under a presumption of denial. Our office informed you by letter dated June 20, 2013, of this action which applies to all future brokering requests. A presumption of denial essentially means that our office has placed any broker request Dolarian may make under a heightened level of scrutiny that will likely result in denial."

59.     On July 16, 2014, Dolarian returned into the United States through Dallas Fort Worth International Airport. Dolarian was selected for a secondary examination and told CBP officers that he had traveled to Bulgaria, Czech Republic, Belgium, Iraq and Turkey on business. Dolarian told CBP officers he was in the weapons supply business and he made this trip to meet with suppliers and executives of the companies he does business with.

60.     On August 8, 2014, DDTC denied DCI's June 19, 2014 brokering application, BA-L-039-14.   The DDTC letter stated:   "The attached application has been voided and is RETURNED WITHOUT ACTION for the reasons indicated below. The applicant may take necessary corrective action and resubmit the request as a completely new application."   The letter

14

included the following reasons for the denial:

> "The Office of Defense Trade Controls Compliance is conducting a review of Dolarian Capital Inc. and compliance with the International Traffic in Arms Regulation (22 C.F.R. 120-130). That review is based in part on a series of end-use monitoring inquiries on previously approved brokering approvals. Results of those inquiries raised questions about the validity of the proposed brokering transactions and the identity of all parties to the transactions. Pending satisfaction of the review by this office, this authorization request is not approved at this time.

Thus, DDTC's August 8, 2014 correspondence made clear to DCI that DCI did not have DDTC approval to broker arms to Nigeria in connection with DCI's June 19, 2014 brokering request.

61. On August 14, 2014 Dolarian returned to the United States and was selected for a secondary examination. During this examination, Dolarian explained that after leaving Iraq he traveled to the Czech Republic where he had additional business meetings including meeting with two brokers from Nigeria that he identified as "Mamu and Hima." Dolarian told CBP officers that he spoke with the brokers about future business. Based on my knowledge of this case and my training and experience, I believe that "Hima" is Hima Aboubakar, the S.E.I. representative with whom DCI had entered into Sales Agreements for arms sales to Nigeria.

62. I have reviewed e-mail correspondence between Dolarian and Ford III. Those e-mails were provided by DCI to DDTC. September 2014 emails between Dolarian and Ford III indicate that even though DDTC had not authorized DCI to conduct brokering activity, DCI had already made a down payment with a vendor to purchase some of the weapons DCI sought to broker to Nigeria.

///

///

///

///

///

15

63.     On September 4, 2014, Ford III emailed to Dolarian to obtain a status on the acquisition of

certain items DCI sought to broker to Nigeria that were covered by the Sales Agreements and the

DCI brokering application to DDTC:

> From: Marion Ford (mailto:mgfiii@gmail.com)
> Sent: Thursday, September 4, 2014 2:14PM
> To: Ara Dolarian
> Subject: Re: Up Date
>
> So we can still manage the deal right or are the supplier chain for these particular
> items?

64.     Later that day, on September 4, 2014, Dolarian responded that although he had obtained a

vendor for some of those items (the 68 mm SNEB Rocket (SNEB), the DEFA Type 553 Cannon

(DEFA), and MARTA 115 Type Launch pad (MARTA)), he was having issues with that vendor.

Dolarian's email to Ford III indicated that DCI had already made a down payment with that

vendor:

> On Sep 4, 2014 5:35AM, "Ara Dolarian" <dolarian@dolarian.com> wrote:
>
> Our first vendor for the SNEB, DEFA, and Marta is absolutely and 100% gone and
> will not sell to the Nigerians under any circumstance.   Do not have the Nigerian's
> produce another EUC for the SNEB, DEFA, and or Marta until instructed.
>
> In the next few days or as soon as I get my money back from the first vendor I will
> instruct on who the second vendor is.   Export will not be Bulgaria for the SNEB,
> DEFA, and Marta.

65.     The next day, on September 5, 2014, Ford III asked for clarification on how much the new

vendor would charge for those weapons:

> From: Marion Ford (mailto:mgfiii@gmail.com)
> Sent: Friday, September 05, 2014 2:30AM
> To: Ara Dolarian
> Subject: RE: Up Date
>
> How Much? I thought you had released the first vendor anyway? I do remember
> you telling me about this better source. I will be back in Prague tomorrow. You in
> Kiev? You need some help?

16

66.     Dolarian responded that he was in active negotiations with a second vendor regarding the acquisition of the weapons:

> On Sep 5, 2014 4:21AM, "Ara Dolarian" < dolarian@dolarian.com> wrote:
>
> The DEFA, MARTA and SNEB, I will have secure by Sunday morning. . . .   The first vendor will not return the deposit as I expected.

67.     The weapons mentioned in the above emails are the same items covered by the June 2014 Sales Agreements between DCI and S.E.I., for which DCI sought DDTC approval, which was denied on August 8, 2014.   These emails indicate that not only did DCI make a deposit for the purchase of weapons even though it had not obtained DDTC's approval, but that DCI continued to actively negotiate for the acquisition of those weapons in September 2014, after DDTC had expressly denied DCI's brokering request.   Both actions violate the AECA.

68.     Throughout September 2014, DCI, Dolarian and Smith also continued to move the proceeds of the June 17, 2014 $4,998,647.00 wire they had received from Sawki.

69.     On September 5, 2014, Mary Ann Dolarian opened a second Martel 3D bank account, a Bank of America savings account number 325016557963 (the **Martel 3D Savings Account**). Mary Ann Dolarian is the sole authorized signer on the account, as the "Manager" of Martel 3D.

70.     On September 8, 2014, Smith purchased a $3,200,000.00 cashier's check ($3,000,000.00 from Smith's money market account (#1677) and $200,000 from Smith's Checking Account (#2975)).   That $3,200,000.00 cashier's check was deposited into the **Martel 3D Savings Account.**

71.     Three days later, on September 11, 2014, more Nigerian funds arrived into Smith's Checking Account (#2975): S.E.I. wired $3,620,000.00 to Smith's JP Morgan Chase account (#2975).

72.     On September 12, 2014, the day after those funds were received, Smith transferred $3,600,000 out of Smith's Checking Account (#2975) and into Smith's money market account

(#1677).

73.     On September 22, 2014, Smith wired an additional $515,664.69 from Smith's Checking Account (#2975) to Ford III's UniCredit Bank account.  This was the same account into which Ford III had received the $712k wire on June 30 from Smith, and bringing Ford III's total possession of Nigerian funds to roughly $1.3m.

74.     On September 23, 2014, Smith purchased a cashier's check in the amount of $3,626,855.52.   Of that amount, $3,263,412.61 was withdrawn from Smith's money market account (#1677) and $363.442.91 was withdrawn from Smith's Checking Account (#2975).   That $3,626,855.52 cashier's check was deposited into the **Martel 3D Savings Account**.

75.     Thus, after the deposits of the September 8, 2014 and September 23, 2014 cashier's checks, a total of $6,826,855.52 in Nigeria-originated funds had been funneled from Smith's accounts into the **Martel 3D Savings Account**.   That money would soon move again.

76.     On September 26, 2014, Dolarian opened a Citibank checking account 205912785 (2785) in the name of Arthur Ave. Consulting, Inc. (the **Arthur Ave. Checking Account**). Ara and Mary Ann Dolarian are co-signers on the account.   On October 2, 2014, Martel 3D transferred $350,000.000 (by cashier's check) to the **Arthur Ave. Checking Account**.

77.     On October 14, 2014 and November 10, 2014, $80,763.70 and $100,000.000, respectively, were transferred from the **Martel 3D Savings Account** to the **Martel 3D Checking Account**.

78.     On November 25, 2014, Dolarian opened a second Arthur Ave. Consulting bank account at Citibank, money market account 206054579 (the **Arthur Ave. Money Market Account**).   Ara and Mary Ann Dolarian are co-signers on the account.   On November 28, 2014, Martel 3D transferred $4,000,000.00 (by cashier's check) from the **Martel 3D Savings Account** into the **Arthur Ave. Money Market Account**.

79.     Open source checks and California Corporation records reveal that Arthur Ave. Consulting, Inc. is incorporated in Fresno, California. The registered agent is Myron Smith at 1284

18

W Shaw #103, Fresno, CA 93711.

80.     Open source research into Martel 3D and Arthur Ave. Consulting revealed no advertisements, internet presence, or listings on business websites. There is also no readily discoverable information that explains the purpose of either business. In my training and experience, companies actively involved in commerce advertise in a number of ways and seek to inform the public about the existence and purpose of their company in order to obtain interested customers.   Based on my training and experience, DCI, Dolarian and Smith appear to have used these entities and their associated **Accounts** in attempts to make the source of the Nigerian-originated money more difficult to trace.

81.     On January 8, 2015, Dolarian and his wife traveled to Paris, France. While in Paris, Dolarian was placed under surveillance by French authorities. On January 9, 2015, between 10:45 am and 11:15 am, authorities witnessed Dolarian with an individual they identified as Hima Aboubakar of S.E.I.

82.     On January 10, 2015, French authorities witnessed Dolarian get into a car driven by Hima Aboubakar. Between 10:50am and 2:30pm Dolarian and Aboubakar drove through Paris making several stops around including an apartment building near the Angolan Embassy and a Maserati dealership. At 2:30pm, Aboubakar and Dolarian returned to Dolarian's hotel and Aboubakar departed.

83.     On January 12, 2015, Dolarian and his wife traveled to Sofia, Bulgaria, Dolarian's wife thereafter returned to the United States on January 16, 2015, and Dolarian traveled to Cairo, Egypt.

///

///

///

///

///

19



# Summary Chart
# DCI/Dolarian 2014 Brokering Activity
**(All dates are on or about, all dollar values rounded)**
**(The Accounts in this Seizure Warrant reflected in Red)**

Nigerian National Security Advisor's Office

$20 million
5/28/14 & 6/9/14

Societe D'Equipments Internationaux
(Abuja, Nigeria)
Hima Aboubakar (Niger)

SK-Sawki Limited
Hong Kong Furniture Company
Souleymane & Kabirou (Niger)

$3.62 million
9/11/14

$5 million
6/17/14

Myron Smith, Attorney
(Fresno)

$515K
9/22/14

Marion Ford III
Dolarian's
Agent
(CZ Republic)

$4.7 million
6/20/14

$6.8 million
9/8/14 & 9/24/14

$3.8 million
7/23, 7/24/14

Martel 3D Savings Account
Martel 3D Checking Account

$712K
6/30/14

Dolarian Capital Inc.
Ara Dolarian
(Fresno)

$4.35 million
10/2/14 & 11/28/14

Arthur Ave. Money Market Account
Arthur Ave. Checking Account

20

## SUMMARY OF TRACING OF PROCEEDS TO ACCOUNTS

84.     In summary, I have traced approximately $8,618,647.00 obtained from Nigeria (through Sawki and S.E.I.) into the **Accounts**, believed to be proceeds of illegal brokering activity, as more described below:

a.     The balance of funds maintained at Bank of America Savings Account Number #325016557963 titled in the name of "Martel 3D" in an amount not to exceed $2,296,091.82 (the "**Martel 3D Savings Account**").

Summary of Tracing:   On June 17, 2014, Smith received a $4,998,647.00 wire transfer from Nigeria though Sawki.   On September 11, 2014, Smith received a $3,620,000.00 wire transfer from Nigeria through S.E.I.   These two wires totaled $8,618,647.00.   Between September 8, 2014 and September 23, 2014, Smith and/or others moved $6,826,855.52 of this $8,618,647.00 into the **Martel 3D Savings Account.**

(This seizure warrant seeks only the seizure of $2,296,091.82 because a total of $4,530,763.70 of the $6,826,855.52 received from Nigeria were transferred into the **Martel 3D Checking Account** ($180,763.70), the **Arthur Ave. Money Market Account** ($4,000,000.00) and the **Arthur Ave. Checking Account** ($350,000.00), leaving a remaining traceable balance of $2,296,091.82).

b.     The balance of funds maintained at Bank of America Checking Account Number #000577161654 titled in the name of "Martel 3D" in an amount not to exceed $330,763.70 (the "**Martel 3D Checking Account**")

Summary of Tracing:   $150,000.00 was deposited into the **Martel 3D Checking Account** through the now-closed DCI checking account (#2300), which account received the Sawki funds through Smith.     The remaining $180,763.70 was deposited into the **Martel 3D Checking Account** from the **Martel 3D Savings Account.**   The $180,763.70 received from the **Martel 3D Savings Account** is directly traceable to Nigeria as outlined above.

c.     The balance of funds maintained at Citibank Money Market Account Number #206054579 titled in the name of "Arthur Ave. Consulting, Inc." in an amount not to exceed $4,000,000.00 (the "**Arthur Ave. Money Market Account**")

Summary of Tracing: On November 25, 2014, the **Arthur Ave. Money Market Account** received a $4,000,000.00 cashier's check which had been drawn on funds withdrawn from the **Martel 3D Savings Account.**   The $4,000,000.00 from the **Martel 3D Savings Account** is directly traceable to Nigeria as outlined above.

d. The balance of funds maintained at Citibank Checking Account Number #205912785 titled in the name of "Arthur Ave. Consulting, Inc." in an amount not to exceed $350,000.00 ("**Arthur Ave. Checking Account**").

> Summary of Tracing: On October 2, 2014, the **Arthur Ave. Checking Account** received a $350,000.00 cashier's check which had been drawn on funds withdrawn from the **Martel 3D Savings Account**. The $350,000.00 from the **Martel 3D Savings Account** is directly traceable to Nigeria as outlined above.

## CONCLUSION

85.     I believe that there is probable cause to believe that the monies on deposit in the **Accounts** in the amounts stated in this affidavit are proceeds of illegal arms brokering, in violation of AECA and ITAR.

86.     DCI, Dolarian, and Smith did not have authorization from DDTC to conduct brokering activity for the sale of weapons and munitions to Nigeria.   Yet without requisite approval, Dolarian, DCI and his affiliates took actions to broker defense articles to Nigeria beginning in or around June 2014 (or earlier) and continuing throughout 2014.

87.     Specifically, (1) in early June 2014, DCI entered into Sales Agreements with Nigerian government entities for the sale of weapons (the final of which contracts was valued at $8,616,042.50); (2) in or around September 2014, DCI negotiated with arms vendors and made payments to arms vendors for the acquisition of weapons intended to be transferred to Nigeria; and (3) DCI received $8,618,647.00 in wire transfers from Nigeria (through a series of intermediaries) that appear to be payments for the weapons contracted for between June and September 2014 intended for Nigeria (and such funds were not held in escrow but were used in part to pay a DCI agent in the Czech Republic and other expenses, and were transferred to bank accounts of various DCI-controlled nominee companies).   All of these actions were taken without DDTC approval.

88.     Of that $8,618,647.00 obtained by wire from Nigeria, $6,976,855.52 is traceable into the **Accounts** as follows:   (a)   $2,296,091.82 in the **Martel 3D Savings Account**; (b) $330,763.70 in the **Martel 3D Checking Account**; (c) $4,000,000.00 in the **Arthur Ave. Money Market Account**; and (d) $350,000.00 in the **Arthur Ave. Checking Account**.   Such amounts are

22

therefore subject to forfeiture as proceeds of the specified unlawful activity of unlawful brokering activities in violation of the AECA and ITAR, pursuant to 18 U.S.C. §§ 981(a)(1)(C), 1956(a)(7) and 28 U.S.C. § 2461.

## REQUEST FOR SEALING

89.     I further request that the Court order that all papers in support of this application, including the affidavit and seizure warrant, be sealed until further order of the Court.   These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.   Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation and may lead to the concealment or dissipation of assets.


Respectfully submitted,


Special Agent Jeremy Kiser
Homeland Security Investigations

Subscribed and sworn to before me this _2_ day of February, 2015.


HON. GARY S. AUSTIN
United State Magistrate Judge


Approved as to form:

/s/ JEFFREY A. SPIVAK
JEFFREY A. SPIVAK
Assistant U.S. Attorney


23